L. Kathleen Chaney
Lambdin & Chaney, LLP
4949 S Syracuse St, Suite 600
Denver, CO 80237
kchaney@lclaw.net
(303) 799-8889
(303) 799-3700

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2016 MAR 17   AM 10 36

STEPHAN HARRIS, CLERK
CASPER

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF WYOMING

Civil Action No. 16 CV 53- J

EMPLOYERS MUTUAL CASUALTY COMPANY, an Iowa corporation,

    Plaintiff,

v.

SCHMID SAND AND GRAVEL, INC., a Wyoming corporation
STATE OF WYOMING, DEPARTMENT OF ENVIRONMENTAL QUALITY

    Defendants.

---

## COMPLAINT FOR DECLARATORY JUDGMENT

---

    Plaintiff, Employers Mutual Casualty Company, by and through its attorneys, Lambdin & Chaney, LLP, for its Complaint for Declaratory Judgment states the following:

### I. JURISDICTION AND PARTIES

    1.    Employers Mutual Casualty Company (hereinafter "EMC") is an Iowa corporation with its principal place of business in Des Moines, Iowa.

    2.    Schmid Sand & Gravel, Inc. (hereinafter "SSG") is a Wyoming corporation with its principal place of business in La Barge, Wyoming.

    3.    The State of Wyoming, Department of Environmental Quality, is a Wyoming governmental entity.

Receipt # CAS16137
Summons: ✓ issued
           not issued

4.      Plaintiff is of diverse citizenship from both of the Defendants. The matter in controversy exceeds, exclusive of interest and costs, the sum specified in 28 U.S.C. § 1332. The Court also has supplemental jurisdiction over all other claims herein, including claims for money damages, because said claims are so related to claims for declaratory judgment in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

5.      EMC brings this action pursuant to the Declaratory Judgment Act for construction of a commercial liability policy and a declaration that EMC does not owe a duty to defend or indemnify SSG in regard to the claims presently made against it by the State of Wyoming as described below. EMC also seeks affirmative relief in the form of money damages for reimbursement of attorney fees and expenses incurred and paid in defending SSG against the State of Wyoming's claims.

6.      All necessary parties under F.R.C.P. Rule 57 and 28 U.S.C. § 2201 are before the Court.

7.      Venue is this judicial district is proper under 28 U.S.C. § 1391 because the defendants reside within the District of Wyoming and the events giving rise to the claims asserted herein occurred within the District of Wyoming.

8.      EMC complied with the notice requirements under the Wyoming Governmental Claims Act, Wyo. Stat. § 1-39-101 *et seq.*, providing EMC's signature certified to be under the penalty of perjury, attached as ***Exhibit 1***.

## II. THE EMC POLICY

9.  EMC issued commercial policy number 2D4-47-60--16 to SSG, effective 03/01/2015 to 03/01/2016, with a business description of grading contractor, attached as *Exhibit 2*.

10.  The exposure or classification related to blasting operations was not rated by EMC's Denver branch as it does not insure any companies that have known blasting operations. Further, SSG did not disclose that exposure. In fact, on the application, SSG represented that its operations do not include blasting as follows:

| 2. DO ANY OPERATIONS INCLUDE BLASTING OR UTILIZE OR STORE EXPLOSIVE MATERIAL? | N |
|---|---|

11.  The policy contains a Commercial General Liability Coverage Form, CG 00 01 04 13 and a Commercial Liability Umbrella Coverage Form, CU 00 01 04 13, which contain the same pertinent policy provisions.

12.  The policy provides in pertinent part as follows:

**SECTION I – COVERAGES, COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

1.  **Insuring Agreement**

    a.  We will pay those sums that the insured becomes obligated to pay as damages of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. * * *

- 3 -

   **b.**   This insurance applies to "bodily injury" and "property damage" only if:

       **(1)**   The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory[.]"

**2.**   **Exclusions**

This insurance does not apply to:

**a.**   **Expected Or Intended Injury**[1]

"Bodily injury" or "property damage" expected or intended from the standpoint of an insured. . . .

**b.**   **Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

    **(1)**   That the insured would have in the absence of the contract or agreement; or

    **(2)**   Assumed in a contract or agreement that is an "insured contract"[.] . . .

**j.**   **Damage To Property**[2]

"Property damage" to:

    *       *       *

    **(4)**   Personal property in the care, custody or control of the insured.

    **(5)**   That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

---

[1] As amended by endorsement CG7191 – **GENERAL LIABILITY ESSENTIAL EXTENSION**
[2] This is exclusion m. in the Commercial Umbrella Liability Coverage Form, CU 00 01 04 13.

(6)   That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

\*      \*      \*

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

Pursuant to endorsement CG7422, **EXCLUSION – INJURY OR DAMAGE FROM EARTH MOVEMENT:**

This insurance does not apply to . . . "property damage" . . . arising out of, caused by, resulting from, contributed to, aggravated by, or related to earthquake, landslide, mudflow, subsidence, settling, slipping, falling away, shrinking, expansion, caving in, shifting, eroding, rising, tilting or any other movement of land, earth or mud.

## SECTION V – DEFINITIONS[3]

9.      "Insured contract" means:

\*      \*      \*

f.      That part of any other contract or agreement pertaining to your business . . . under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

\*      \*      \*

13.     "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

16.     "Products-completed operations hazard":

a.      Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

---

[3] The Commercial Umbrella Liability Coverage Form, CU 00 01 04 13, contains the same Definitions.

(1)     Products that are still in your physical possession; or

(2)     Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

     (a)     When all of the work called for in your contract has been completed.

     (b)     When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

     (c)     When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

     *     *     *

17.     "Property Damage" means:

a.     Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b.     Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

     *     *     *

## II. THE PROJECT AND CLAIMS

13.     This matter arises out of highwall blasting work performed at the McIntosh Uranium Pit ("Project") located in Fremont County, Wyoming. The overall purpose of the

Project is to mitigate hazardous conditions to the general public presented by the open pit mine pit and toxic, acid forming and/or radioactive mine waste materials associated with abandoned uranium mines.

14.     The Wyoming Department of Environmental Quality, Abandoned Mine Land Division (AML) is the Project Owner.

15.     BRS Engineering (BRS) provided the engineering design and construction management for the project.

16.     Schmid Sand and Gravel (SSG) was the Contractor for the Project.

17.     Buckley Powder was hired by SSG to do the highwall blasting.

18.     The claimed damages occurred during Phase 2 of the Project, and specifically occurred on three separate dates: May 8, 2015 (Shot #1); June 30, 2015 (Shot #5); and July 10, 2015 (Shot #6).

19.     On May 8, 2015, Shot #1 was performed by Buckley Powder as a subcontractor to SSG.

20.     According to BRS' Interpretation for damage due to Shot #1 dated June 17, 2015, SSG had the sole responsibility to prepare a blasting plan responsive to the site conditions in accordance with the Contract Specifications as follows:

- According to the Contract Documents, Section G.2-D, the Contractor represents he has examined the site and latent physical conditions, and made such investigations as he deems necessary for the performance of the work. As a result, the responsibility for preparing blasting plans which are responsive to the site conditions is the sole responsibility Contractor in accordance with the Contract Specifications.

- Per the contract documents, Section G.6-A, the Contractor is solely responsible for the means, method, technique, sequence, and procedure of construction on the site. As a result the Contractor and his subcontractor are contractually responsible for the blasts which created the damage.

- The presence of the arrays was an existing condition for Phase 2, which SSG accepted as part of the project per Section G.2-D, and cannot be construed to represent a change of conditions. As an existing condition, per Section G.6-K the Contractor is responsible for taking necessary safety precautions to prevent damage to equipment and utilities.

- Per the contract specifications, Section G.9-G, the Engineer is not responsible for the Contractor's means, methods, techniques, sequences, or procedures of construction, or the safety precautions and programs, nor is the Engineer responsible for the acts or omissions of the Contractor or his subcontractors.

The above Engineer's Interpretation was provided to SSG prior to the blasting of Shots 5 and 6.

21.    Following the May 8, 2015 incident, BRS requested in a letter dated June 1, 2015, that SSG consider their plans and methods for future shots on the highwall face to minimize the amount of material that would enter the pit.

22.    According to BRS, in a field meeting prior to Shot #5, SSG indicated to BRS that they intended to blast an open face of 80 to 100' tall on the final bench for Shots 5 and 6, due to Shots 3 and 4 being completed at shallower depths than the original 60' bench plan. BRS replied in a letter dated June 15, 2015 that it was not advisable to shoot a large open face into the pit, as the potential volume displaced into the pit will increase, subsequently increasing the magnitude of any wave action. The letter further stated:

"As shots of the 80 to 100' depths currently contemplated are well beyond the scope of the blasting completed on Phase 1 and as discussed during the preconstruction representations, it is considered to be a change of means and methods for the Contractor's convenience. Based upon the contract specifications, Section G-6.K, it is the Contractor's responsibility to perform the work in a safe manner that is protective of the property of others. As it is uncertain what the

effect of blasting the highwall at depths in excess of what is currently proven to be of low impact to the arrays existing on the pit surface, any damage to the property of the State of Wyoming would be the responsibility of Schmid Sand and Gravel. If it is desired to remove the arrays from the pit, the cost and effort required should be borne by Schmid Sand and Gravel as the proposed change in means and methods is solely for the Contractor's convenience."

23.     Shot 5 was planned, drilled, loaded, and fired by Buckley Powder, a subcontractor to SSG on June 30, 2015. A large volume of earthen material was blasted from the open face into the pit. Upon impacting the pit water, it created a large wave which damaged the evaporative dewatering arrays which remained floating on the surface of the pit. The magnitude of the wave was similar to, if not greater than, the wave created by Shot 1, and the water level in the pit was higher than the previous level. The waves caused the arrays to be damaged including breaking of the 12" T's where the main supply line intersected the array manifolds and minor damage to other components.

24.     Shot 6 was executed in the same manner as Shot 5 described above, despite the evident damage caused by Shot 5. A similar large volume of earthen material blasted from the open face resulted from Shot 6, with a resulting wave which appeared more violent than any previous waves. The damaged arrays sustained additional damage, primarily to Arrays 2 and 3, as they were severely contorted and twisted by the wave, causing HDPE array pipe to be folded back upon itself, creating tears and severing the pipe in multiple locations, as well as breaking multiple risers.

25.     The presence of the arrays on the surface of the McIntosh pit water was an existing condition for Shot 5 and 6. In the letter dated June 6, 2015, SSG recommended that the arrays possibly be removed from the pit until Shots 5 and 6 are completed. In the response from

BRS to SSG dated June 15, 2015, it was stated that the cost and effort to remove the arrays from the pit should be borne by SSG, and any damage caused by Shots 5 and 6 would be the responsibility of SSG, as the blasting of 80 to 100˚ faces was considered a change of means and methods for the Contractor's convenience.

26.    In addition, the Engineer's Interpretation dated June 17, 2015 stated:

> "Frequent removal of the arrays from their location is both time and cost prohibitive. As such, it would be the Contractor's responsibility to determine the purpose and need for such a removal, and to bear the burden of cost for the removal. Alternatively, the Contractor could plan the work in a manner that was protective of the existing site facilities."

27.    The letter of June 15 and the Engineer's Interpretation of June 17 were ignored. The arrays were not moved, and Shots 5 & 6 were not completed in a protective manner, which Shots 3 and 4 demonstrated was possible. Section G.6-B states that the Contractor is fully responsible for all acts and omissions of Subcontractors. As a result, it was SSG's responsibility to ensure that the work completed by Buckley Powder was completed in compliance with the contract, and was protective of the property of the state.

28.    As with Shot 1, the Contractor was responsible for safety and prevention of damage to property during Shots 5 and 6. The responsibility for preparing blasts which were protective of the state's property contractually belongs solely to the Contractor. As the Contractor is responsible for means and method on the project, regardless of intent, damage due to the Contractor and his subcontractors is the Contractor's responsibility. The contract requires the Contractor and subcontractors to carry liability insurance to cover damage to the property of

others due to their actions. The Contractor is fully responsible for the acts and omissions of subcontractors according to the Contract.

29.     Through the letter of June 15 and the Engineer's Interpretation of June 17, SSG was warned against blasting large open faces as was done in Shot 5 and 6. SSG had demonstrated through Shots 3 and 4 that the work could have been completed in a manner that was protective of the state's property. The timing of the blasts was done in a way to move material toward the pit, while other options existed. SSG was also offered the opportunity to remove the arrays from the pit at their cost prior to Shots 5. SSG did not respond to the warnings against the verbal blast plan, and did not take steps to protect the arrays prior to Shot 5. After observing the damaging effects of Shot 5, SSG did not take protective measures prior to Shot 6, but rather apparently increased the powder factor for Shot 6 and caused additional damage to the property of the State.

30.     Upon information and belief, the damage to the State of Wyoming's property is estimated to be $885,937.99.

31.     EMC denied coverage for the claimed damages.

### III. FIRST CLAIM FOR RELIEF

32.     Plaintiff seeks declaratory judgment, pursuant to the Federal Declaratory Judgments Law, 28 U.S.C. § 2201 *et seq.* and F.R.C.P. 57, that there is no duty to defend or indemnify SSG for the damage arising out of or related to the blasting operations that occurred on May 8, 2015 (Shot #1); June 30, 2015 (Shot #5); and July 10, 2015 (Shot #6), specifically but not limited to:

a.  there has not been an "occurrence" but instead the claimed damages resulted from a breach of contractual obligations in the face of damages that were foreseeable and expected if the proper precautions were not undertaken as required by the contract;

b.  coverage is precluded because the damaged property was within the care, custody or control of SSG who had the sole contractual responsibility not to damage the State's property during its (or its subcontractors) operations and if that required removal of the arrays and associated equipment, then it was SSG's contractual responsibility to incur the cost and effort to do so;

c.  coverage is precluded because the damage arose out of blasting operations, which were not rated by EMC's Denver branch as it does not insure any companies that have known blasting operations and SSG did not disclose that exposure. EMC only insured SSG's grading business pursuant to the policy's provisions; and/or

d.  coverage is precluded because the policy excludes property damage arising out of, caused by or resulting from earth movement.

33.     In requesting this declaratory relief, Plaintiff is requesting an interpretation of the rights, legal status and relationships of the parties under the above law and facts.

34.     Such interpretation is appropriate under the provisions of the Federal Declaratory Judgments Law, 28 U.S.C. § 2201 *et seq.* and F.R.C.P. 57.

- 12 -

## IV.  SECOND CLAIM FOR RELIEF

35.     Pursuant to endorsement IL  01  14  10  13 – **WYOMING CHANGES – DEFENSE COSTS,** in agreeing to extend a defense to SSG, EMC reserved the right to seek an award of money damages in the form of reimbursement of attorney fees and expenses made by EMC in the defense of the claims asserted by the State of Wyoming.

WHEREFORE, Plaintiff requests that the Court determine the rights, status or other legal relations of the parties under the above law and facts, and for all other relief to which Plaintiff may be entitled, including costs, expenses, attorney fees and pre- and post-judgment interest as may be permitted by law.

PLAINTIFF REQUESTS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

DATED this 17th day of March, 2016.

Respectfully submitted,

LAMBDIN & CHANEY, LLP

By: _____
L. Kathleen Chaney, Esq.
4949 S. Syracuse Street, Suite 600
Denver, Colorado 80237
Telephone:     (303) 799-8889
Facsimile:      (303) 799-3700
Email:          kchaney@lclaw.net

*Attorneys for EMC*

- 13 -